

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 20, 2019**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| JEFFERY MICHEAL HUNT, | § | Case No.:  18-20072-RLJ-7 |
| | § | |
| Debtor. | § | |
| _____ | § | _____ |
| | § | |
| ROBERT D. PHELPS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 18-02011 |
| | § | |
| JEFFERY MICHEAL HUNT, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

On April 2nd and 3rd, the Court conducted the trial on the complaint of Robert D. Phelps

(Phelps) against chapter 7 debtor, Jeffery Micheal Hunt (Hunt).  Phelps asserts the following

seven claims: (1) objection to discharge of Phelps's claim under § 523(a)(2)(A); (2) objection to

discharge of Phelps's claim under § 523(a)(2)(B); (3) objection to discharge of Phelps's claim

under § 523(a)(4); (4) objection to discharge of Phelps's claim under § 523(a)(6); (5) objection to Hunt's discharge under § 727(a)(3); (6) objection to Hunt's discharge under § 727(a)(4)(A); and (7) a claim for attorney's fees and costs.[1]

In addition to denying the factual basis for each of Phelps's causes of action, Hunt raises the following affirmative defenses: (1) failure to state a claim upon which relief may be granted (Federal Rule of Civil Procedure (FRCP) 12(b)(6)); (2) general denial that Phelps sustained damages and that Hunt caused any damages; (3) exercise of his best judgment under the Business Judgment Rule; and (4) that Phelps's claims under § 523 are barred as untimely.[2] On the last point, the Court has issued its Memorandum Opinion and Order that grants the motion of Phelps (and his attorney, Ernest Nycz) to amend the Court's order of August 6, 2018 to provide that the deadline to file discharge and *dischargeability* complaints was extended to September 18, 2018. Case No. 18-20072, Doc. No. 47.

Hunt also submitted the following contested issues of law in the pre-trial order: (1) whether his actions were sufficiently justified to overcome a challenge to his discharge under § 727(a)(3); (2) whether Phelps is precluded from raising his § 523 claims under Bankruptcy Rule 4007(c); and (3) whether Phelps met his burden under FRCP 12(b)(6).[3]

As set forth, the Court finds and concludes that Phelps shall be granted a nondischargeable claim of $55,000 against Hunt under § 523(a)(4) and (a)(6) of the Bankruptcy Code. All other requested relief is denied.

---

[1] Doc. No. 1. All "Doc. No." references herein are to the current adversary proceeding, Case No. 18-02011, unless otherwise stated. All "§" references herein are to Title 11 of the United States Code, unless otherwise stated.
[2] Doc. No. 7.
[3] Doc. No. 20.

# I.

## Background

Phelps and Hunt first met in early Summer, 2014. Phelps, a podiatrist in Tyler, Texas, was interested in franchising opportunities with Tea 2 Go, a company that operated tea stores, mostly in Texas, that catered to walk-in customers. Hunt was the principal owner and manager of the Tea 2 Go stores. He had started the business under the company he formed, Tea 2 Go, LLC. Through the LLC, he was promoting and offering Tea 2 Go franchises. Phelps had no experience with operating a small retail outlet but was looking for an investment for his retirement years. Hunt was based out of Lubbock where Phelps's daughter was attending Texas Tech.

In their initial discussions, Hunt, according to Phelps, told Phelps that his existing tea stores were doing extremely well, that they were grossing $750,000 to $1.5 million per year. Phelps also said that Hunt told him that he had sold a tanning business for over $2 million.

Each of the franchises was tied to a specific territory where the prospective owner would have the exclusive right to open a Tea 2 Go store. The stated cost to Phelps of each territory, the franchise fee, was $30,000. In addition, Phelps, as franchisee, would have to pay for the "build-out" of each store so that it would conform to the Tea 2 Go concept. The cost for the build-out, Hunt told Phelps, was $125,000 to $175,000. Phelps testified that Hunt elaborated on the riches to be made from the franchises.

Hunt provided Phelps with two sets of written materials. On October 19, 2014, Hunt sent store "projections" to Phelps for twelve Tea 2 Go stores—two each in Amarillo and Lubbock and one in each of Abilene, Colleyville, Farmers Branch, Midland, Plainview, Sugarland, Waco, and Tempe, Arizona. Pl.'s Ex. 44. The projection for each store reflected an annual profit. The

3

basic costs and operations for each store are reflected with *hoped-for* income from anticipated sales multiplied by an average price per sale. The projected net of operating costs and income ranged from a low of approximately $114,000 to a high of over $880,000. *Id*. The projections, realistically considered, were speculative.

Phelps was also given a Tea 2 Go Franchise Disclosure Statement dated February 9, 2015. Pl.'s Ex. 2. This included the disclosures presumably required by law. It reflected that the franchise fee was $20,000, with an additional $10,500 for advertising the store's opening and for licensing and software. An *estimated* additional maximum amount of $50,000 was allocated for the store's equipment. The costs for each of "property," construction, and utilities were listed as "varies." *Id*. Royalty payments were 4% of gross revenues each quarter. The brochure reflected that the franchisor, Tea 2 Go, LLC, had assets of $569,910 and liabilities of $213,574. The most valuable single asset is stated as "Assets"—without elaboration—of $386,000. *Id*.

Between August 2014 and mid-to-late 2015, Phelps acquired nine territories, each with an exclusive right to open and operate a Tea 2 Go store. The first franchise he acquired was for College Station, Texas. He paid the $30,000 franchise fee in August 2014. College Station was a complete failure. In addition to the initial fee, Phelps acquired a store on a 10-year lease. He testified that he paid $365,000 for the build-out of the store. Based on his conversations with Hunt, he expected that such cost would run no more than $175,000. Tea 2 Go's involvement as franchisor was minimal. Phelps found the facility and negotiated the lease; he hired a consultant to advise him on the build-out. Construction was delayed; the store opened on September 11, 2015, several months past the anticipated opening date. Tea 2 Go provided staff training for a few days before the store opened but very little assistance after it opened. The College Station store never made a profit and closed a year and a half after opening. Phelps sold the store but, in

doing so, financed part of the purchase price for the buyer. The sales price was $110,000, with $20,000 paid down and the balance of $90,000 financed by Phelps for three years. The buyer defaulted, and Phelps lost at least $50,000 on the sale. Phelps asserts a total claim against Hunt of $462,000 on the College Station investment: $30,000 for the franchise fee, $365,000 for the build-out, $45,000 for lease payments, $72,000 in operating losses, and a credit of $50,000 that he received on the sale of the store.

In addition to College Station, Phelps purchased rights to the following Tea 2 Go franchises: Katy, Spring, Tyler, Lufkin, Longview, Rockwall, Brenham, and Nacogdoches. He paid the full franchise fee of $30,000 for each of Katy, Spring, and Tyler. He made a down payment of $5,000 against the franchise fee for each of the other five territories; he invested nothing further on the five, however. Phelps made no further investment, apart from the $30,000 fee, for the Katy territory—no store was started. He did, however, obtain a lease and do a build-out for each of Spring and Tyler. They, like College Station, were also failures. Phelps spent an additional $392,000 for build-out and lease expenses on the Spring store. It never opened. He spent an additional $200,000 on the Tyler store. It opened in August 2017 and closed within a year. The store lost over $70,000. (By its opening, Phelps had abandoned the Tea 2 Go concept; he named the store Coffee, Tea, & Me.)

In the Spring of 2016, Phelps made an investment at Hunt's prompting that was different from the prior franchising deals. For $50,000 (or $55,000),[4] he obtained, *from Hunt personally*, a 49% interest in a company-owned tea store in Austin. The purchased-interest was *not* for an

---

[4]According to Phelps, this purchase established a partnership, the purpose of which was to open a Tea 2 Go store in the Austin, Texas area (the Austin store). The Membership Interest Purchase Agreement stated a $55,000 purchase price, but there is disagreement over whether Phelps paid Hunt the full $55,000. Phelps said that he paid the purchase price in full, whereas Hunt maintains that Phelps paid only $50,000. Phelps credibly testified that he paid the $50,000 by a wire transfer with the additional $5,000 paid by his wholly-owned company, Mr. JP Ventures, LLC. The Court is satisfied that $55,000 was paid and that Hunt's denial amounts to gamesmanship.

interest in Tea 2 Go; instead, it was for an interest in EJ T Kickers, LLC, a Texas limited liability company. Phelps never received a signed purchase agreement from Hunt. Within a few weeks after Phelps's purchase, and unbeknownst to Phelps, Hunt sold the store for $50,000. And after Hunt had sold the store, Phelps inquired of the store's status; Hunt did not tell him then that he had sold the store—he instead said he needed an additional $8,000 to cover expenses related to the store. Hunt never accounted back to Phelps for his share of any proceeds from the sale.

The evidence confirms that Phelps's $50,000 wire transfer was deposited in an account of Tea 2 Go, LLC's and then immediately paid out on Tea 2 Go loans. In addition, Phelps testified that all claims of Mr. JP Ventures, LLC, which had paid an additional $5,000 for the Austin store, were assigned to him, personally.[5]

Hunt admitted that, in April of 2016, he and his businesses, Tea 4 U and Tea 2 Go, incurred a default judgment of over $598,000 taken by Midway Associates, LLC. *See also* Pl.'s Ex. 18.

Hunt was the sole member of Tea 2 Go, LLC. He also owned "100% of the issued and outstanding membership interests in EJ T Kickers, LLC." Pl.'s Ex. 3 ¶ A.[6]

Phelps incorrectly asserts that he was in a partnership with Hunt. Rather, Phelps acquired a minority interest in EJ T Kickers, LLC. And no partnership relationship was established for any of the nine franchises purchased by Phelps. The stores (and the rights to open other stores) were acquired by Phelps (or, perhaps, an entity Phelps started, Mr. JP Ventures, LLC) as a franchisee of Tea 2 Go, LLC.

At trial, neither party offered a written franchise agreement into evidence, nor was there any evidence of a company agreement for EJ T Kickers, LLC.

---

[5] *See infra* note 4.
[6] The Membership Interest Purchase Agreement was admitted as a draft of the subject document.

## A.

As with most dischargeability issues, the Court is asked to liquidate the claims that are said to be nondischargeable. This process is complicated by the fact that the plaintiff, Phelps, ostensibly acquired the franchise rights from Tea 2 Go, LLC, of which Hunt was the sole owner. The claim arising from Phelps's purchase of an interest in EJ T Kickers, LLC is simpler, as such interest was acquired from Hunt, personally. Phelps contends that Hunt's conduct, standing alone, was sufficiently egregious to both impose liability and to make any established liability nondischargeable.

Hunt's alleged liability—apart from the dischargeability issues—is measured by (1) the amounts Phelps paid for acquiring and implementing the franchise rights from Tea 2 Go, LLC, and (2) the amount he paid Hunt for the Austin store, specifically the membership interest in EJ T Kickers, LLC.

## 1.

For his purchase of the franchise rights from Tea 2 Go, Phelps has not pleaded that he seeks to pierce the veil to impose liability on Hunt, personally. The Court has, however, addressed the question of a member's personal liability in the related case (involving the same debtor, Hunt), *Trinkets & Tea, LLC v. Hunt*, Adversary No. 18-02006. A manager/member of an LLC is not individually liable for contractual debts and obligations of the LLC, unless there is a finding that the debt or obligation was incurred through actual fraud for the direct personal benefit of the manager/member. *In re Clem*, 583 B.R. 329, 369 (Bankr. N.D. Tex. 2017). Phelps has alleged that he was defrauded by Hunt and that such fraud personally benefitted Hunt.

The evolution of defining actual fraud in the context of piercing the corporate veil is well documented by the Fifth Circuit in *Spring Street Partners–IV, L.P. v. Lam*, 730 F.3d 427 (5th

Cir. 2013). Notably, actual fraud in this veil-piercing context is not equivalent to the tort of fraud. *Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, 832 F.3d 560, 567 (5th Cir. 2016) (citing *Latham v. Burgher*, 320 S.W.3d 602, 607 (Tex. App.—Dallas 2010, no pet.)). Rather, "actual fraud is defined as involving dishonesty of purpose or intent to deceive." *Id.* (citing *Spring St.*, 730 F.3d at 442–43) (internal quotations omitted). If the Court cannot conclude that Hunt's conduct amounted to actual fraud under Texas law, then there can be no debt to discharge, rendering moot the dischargeability issue under § 523(a)(2)(A). *See id.* at 569.

Alternatively, Hunt may be liable, without the need for veil piercing, if he personally committed a fraudulent or intentionally tortious act. Under Texas law, an agent "is personally liable for his own fraudulent or tort[i]ous acts, even when acting within the course and scope of his employment." *Farooqi v. Carroll (In re Carroll)*, 464 B.R. 293, 330–31 (Bankr. N.D. Tex. 2011) (quoting *Sanchez v. Mulvaney*, 274 S.W.3d 708, 712 (Tex. App.—San Antonio 2008, no pet.)) (internal quotation omitted). In an action to hold an agent personally liable for their own fraudulent acts, it is not necessary to pierce the corporate veil. *Id.* at 331.

In *Carroll*, the court considered whether the debtor, who was the chairman, chief executive officer, president, and chief financial officer of a corporate entity, could be held personally liable to Farooqi, a proposed franchisee and the objecting creditor. *Id.* at 301, 309. Prior to Carroll's bankruptcy, Farooqi negotiated a deal to purchase a franchise interest in a restaurant sold by Carroll on behalf of a corporate entity. *Id.* at 302. Farooqi paid a portion of the purchase price under an option contract; when the deal failed, Farooqi was not refunded his payment from Carroll. *Id.* at 303–07. When Carroll filed for bankruptcy protection, Farooqi sought to liquidate his claims against Carroll for fraudulent inducement, fraud, and violations of

the Texas Deceptive Trade Practice Act (DTPA), and to have such claims determined to be nondischargeable under § 523(a)(2)(A). *Id.* at 301, 308–09.

Having first determined that Farooqi proved his fraudulent inducement and DTPA claims against the corporation, the court then needed to decide if Carroll could be held personally liable for the resultant damages. *Id.* at 323, 330. Relying on the Supreme Court of Texas decision in *Miller v. Keyser*, 90 S.W.3d 712 (Tex. 2002), the court held that Carroll was personally liable for the damages caused by his misrepresentations and wrote, "[l]iability attaches because the officers *themselves* made the misrepresentations, . . . [a]gents are personally liable for their own torts." *Id.* at 331 (quoting *Miller*, 90 S.W.3d at 717–18) (emphasis in original) (internal quotation omitted).

Section 523 identifies the debts that may be excepted from the discharge granted an *individual* debtor. § 523(a). And, as noted, the common law rule in Texas provides that agents of corporations are personally liable for their own tortious conduct. Thus if Hunt obtained funds from Phelps by "false pretenses, a false representation, or actual fraud," with the requisite intent, he may be held personally liable for such conduct as an agent of Tea 2 Go, LLC.[7]

Last, the terms of the parties' franchise agreements, as well as the law and regulations governing franchises, may also serve as a potential basis of liability. But apart from generally complaining that the written materials given to him reflected hoped-for financial projections that were too rosy, Phelps has not pleaded or proved any violation of the law or regulations applicable to franchises. Neither Phelps nor Hunt offered into evidence an executed franchise

---

[7] Tea 2 Go, LLC's company agreement does not appoint an agent; however, it vests the manager (Hunt) with authority to designate an agent at the manager's sole discretion. Pl.'s Ex. 12 ¶ 9.1. Section 101.254(a) of the Texas Business Organizations Code states, ". . . each governing person of a limited liability company and each officer of a limited liability company vested with actual or apparent authority by the governing authority of the company is an agent of the company for purposes of carrying out the company's business." Hunt, therefore, is an agent of Tea 2 Go, LLC and was carrying out the company's business when transacting with Phelps regarding the franchise sales.

agreement. The Franchise Disclosure Statement that Hunt gave to Phelps purports to contain an attached franchise agreement, but no such attachment is included. *See* Pl.'s Ex. 2. The Franchise Disclosure Statement generally states the costs of opening and operating a Tea 2 Go franchise location and makes references to the franchisor/franchisee relationship. Pl.'s Ex. 2 at 6–17. It is otherwise silent on liability and simply directs its reader to the franchise agreement (that is not included).

## 2.

As stated, Phelps purchased a minority ownership interest in EJ T Kickers, LLC, Hunt's company that owned the Austin store. Phelps claims that he paid $55,000 for his 49% interest, while Hunt maintains that Phelps paid only $50,000 and that he still owes the remaining $5,000—presumably to EJ T Kickers, LLC.[8] Within a month, Hunt sold the Austin store to a third party, and Phelps received nothing of value from the Austin store or from EJ T Kickers, LLC. Phelps testified that Hunt told him that he had yet another deal that was better and refused to return Phelps's money. Phelps, finally, was not interested and demanded an accounting to which Hunt responded by requesting more money.

Hunt was the majority owner with total control of EJ T Kickers, LLC. He controlled the LLC's assets and was the only person with knowledge of the LLC's financial information and the status of the Austin store's operations. Phelps was a passive investor.

The Court construes Hunt's liability to Phelps, if any, as arising from the base transaction—Hunt's sale of the 49% interest in EJ T Kickers to Phelps—and not as arising from the merits, or not, of the subsequent sale by Hunt of the Austin store. There is no evidence that explains the specifics of the sale of the Austin store. Was it a sale by EJ T Kickers of the assets,

---

[8] Phelps admitted a bank statement from Platinum Bank for an account owned by "Tea 2 Go LLC" with a $50,000 wire transfer into the account, dated March 1, 2016, from "Foot Clinic of E. Texas." Pl.'s Ex. 37.

i.e., the store itself? Or was it a sale of the entity? Hunt's liability is assessed solely on *Hunt's* conduct toward Phelps on the deal and the effect it had on Phelps.

The problems with the Austin store deal are Hunt's intentions at the time he sold the 49% interest to Phelps and his failing to account back to Phelps upon and after the sale of the Austin store. There is no evidence of whether Hunt properly managed the store or whether its sale was reasonable and in the best interest of EJ T Kickers, LLC.

## II.

### A.

The Court has jurisdiction of this action under 28 U.S.C. §§ 1334(b) and 157(a) and by the District Court's Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc, adopted in this district on August 3, 1984. The claims before the Court are core claims under 28 U.S.C. § 157(b)(2)(A), (B), (I), and (J). The parties have consented to the Court deciding all pending claims. The Court has authority to enter a final judgment in this adversary proceeding. 28 U.S.C. § 157(b)(1) and (c)(2); *see Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1948–49 (2015).

Venue is proper under 28 U.S.C. § 1409.

### B.

#### 523(a)(2)(A) and (B) Causes

Section 523(a)(2)(A) excepts from discharge those debts for money, property, or services, or an extension, renewal, or refinancing of credit to the extent obtained by fraud or false pretenses. False or fraudulent representations concerning the debtor's financial condition is excluded from the provision, however. § 523(a)(2)(A). The purpose of the provision is to prevent the debtor from retaining the benefits of property fraudulently obtained. For this reason,

11

the debtor must have received the money (the focus of the dispute here) as a direct result of the

debtor's false representations or actual fraud. *See RecoverEdge, L.P. v. Pentecost*, 44 F.3d 1284,

1292–93 (5th Cir. 1995).

False representations that could render a debt nondischargeable are those that are

knowingly and fraudulently made and that materially concern the transaction at issue. *See Auto.*

*Fin. Corp. v. Nunez (In re Nunez)*, No. 17-33845-hdh7, 2019 WL 1271450, at *2 (Bankr. N.D.

Tex. Mar. 15, 2019). And the party to whom the representation is made must have justifiably

relied on such statements. *See id.* A debtor's failure to fulfill a mere promise is not sufficient to

render a debt nondischargeable. *See generally Goldberg Sec., Inc. v. Scarlata (In re Scarlata)*,

979 F.2d 521, 525 (7th Cir. 1992) (describing the possibility that the debtor's statement of future

intention was true when made). On the other hand, a debtor's failure to fulfill contractual

obligations could make the creditor's claim nondischargeable if the debtor had no intention of

performing the obligations under the contract at the time it was entered. *See AT&T Universal*

*Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 406–07 (5th Cir. 2001).

To prove a cause of action for actual fraud under § 523(a)(2)(A), the creditor must prove

the following:

> (1) the debtor made a representation; (2) the debtor knew that the representation
> was false at the time it was made; (3) the debtor made the representation with the
> intent and purpose to deceive the creditor; (4) the creditor relied on the
> representation; and (5) the creditor sustained a loss as the proximate result of its
> reliance on the representation.

*Nunez*, 2019 WL 1271450, at *3 (citing *Selenberg v. Bates (In re Selenberg)*, 856 F.3d 393, 398

(5th Cir. 2017)). Actual fraud requires scienter and some underlying conduct that involves

"moral turpitude or intentional wrong." *See Pentecost*, 44 F.3d at 1292. Thus, debts arising

from constructively fraudulent conduct fall outside § 523(a)(2)(A). *Id.*

12

Section 523(a)(2)(B) provides that a debt is nondischargeable if it was obtained by use of a written statement that is materially false, that respects the debtor's or an insider's financial condition, that the debtor caused to be made or published with intent to deceive, and upon which the creditor reasonably relied. The first element, a written statement, is evident on its face and not at issue here. The financial disclosure documents provided by Hunt to potential investors satisfy this element.

For the second element—material falsity—the Court notes, as it did previously,

> A materially false statement is one that "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." Further, in determining whether a false statement is material, a relevant although not dispositive inquiry is "whether the lender would have made the loan had he known the debtor's true situation." Finally, it is well-established that writings with pertinent omissions may qualify as "materially false" for purposes of § 523(a)(2)(B).

*Lubbock Nat'l Bank v. Wallace (In re Wallace)*, No. 12-50435-RLJ-7, 2013 WL 5442074, at *4 (Bankr. N.D. Tex. Sept. 27, 2013) (quoting *Jordan v. Se. Nat'l Bank (In re Jordan)*, 927 F.2d 221, 224 (5th Cir. 1991), *overruled on other grounds by In re Coston*, 991 F.2d 257 (5th Cir. 1993)).

Importantly, § 523(a)(2)(B) does not cover every material statement of fact made in writing to a creditor. Rather, the statement must concern the *debtor's* financial condition. § 523(a)(2)(B)(ii). In *American Bank of Commerce v. Powell (In re Powell)*, 423 B.R. 201, 210–11 (Bankr. N.D. Tex. 2010), the court discussed the meaning of "statement respecting . . . financial condition" and noted that there are two competing definitions. Addressing first those cases that adopt a limited definition, the court observed that "the phrase 'statement respecting the debtor's . . . financial condition' as used in section 523(a)(2)(B) means traditional, formal financial statements such as balance sheets, profit/loss statements, and statements of net worth."

13

*Id.* at 210 (internal citations omitted). Conversely, a more liberal construction suggests that the phrase "encompass[es] a much broader class of statements, even those which relate to a single asset or liability." *Id.* at 210–11 (internal citations omitted). Ultimately, the *Powell* court, noting first that the liberal definition was the "emerging majority," adopted the liberal construction to decide that the writings at issue in that case were statements respecting the debtors' financial condition. *Id.*

The debtor must also intend to deceive the creditor at the time such written statements are furnished. § 523(a)(2)(B)(iv). The court considers and weighs the totality of the circumstances to determine if the debtor submitted false financial statements that were either knowingly false or "made so recklessly as to warrant a finding that the debtor acted fraudulently." 4 *Collier on Bankruptcy* ¶ 523.08[2][e][ii] (Richard Levin & Henry J. Sommer eds., 16th ed.). An assertion of honest intent should be weighed against the natural inferences available from the admitted facts. *See id.*

Finally, there must be a finding that the creditor reasonably relied on the false written statement. § 523(a)(2)(B)(iii). Again, the inquiry is made from the totality of the circumstances and the available facts presented at trial. *See In re Coston*, 991 F.2d at 261.

> The bankruptcy court may consider, among other things: whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*Id.* Such considerations are unique to each case, and no court has articulated a system of weighing one factor more heavily than another.

Hunt's oral statements to Phelps that touted the financial performance of the tea stores, even if exaggerated, concerned Tea 2 Go's (and, indirectly, Hunt's) financial condition. And,

from the evidence, the Court cannot conclude that such statements were materially false when made. Phelps was intrigued by the concept of a tea store and believed it would be profitable. And like any investment in a new business, risk is assumed. Such statements fall outside the scope of § 523(a)(2)(A).

The information and projections contained in the February 9, 2015 Franchise Disclosure Statement were not misleading or, based on the evidence, materially wrong. Plus, despite the problems with the College Station store, Phelps continued to invest in other franchises. Apart from the initial franchise fees, Phelps's continued payments for build-outs and rents were paid after he knew of the many potential pitfalls of the Tea 2 Go franchised stores.

For his investments in the nine franchises, the evidence fails to establish that Phelps's payments for the franchises were solicited through intentionally deceitful conduct by Hunt. Phelps ostensibly acquired the franchise rights that he paid for. Tea 2 Go's or Hunt's use of the funds is irrelevant. Hunt's, and thus Tea 2 Go's, lack of commitment to and direction for the franchises may be actionable, but it is not conduct that presents a nondischargeable claim. The evidence wholly fails to establish *that Hunt*, for Phelps's purchase of the franchise rights, sought to deliberately or intentionally injure Phelps.

Phelps failed to satisfy his burden under § 523(a)(2)(A) that Hunt made materially false statements with the intent to deceive him that, in turn, induced his investment, payment of franchise fees, or purchase of an interest in the LLC. Statements concerning future performance or promises could have been true at the time they were made, and the Court should not consider the eventual performance or non-performance of those promises in its analysis. *See Scarlata*, 979 F.2d at 525. Failure to perform contractual obligations is likewise not at issue here because the franchise agreements are silent concerning Hunt's duties as the managing partner or

franchisor. Rather, the agreements are discretionary or, in the case of the franchises, not available for the Court's review.

Phelps failed to prove that his claims should be nondischargeable under § 523(a)(2)(B). The profit and loss statements provided by Hunt fall short of "paint[ing] a substantially untruthful picture" of Hunt's financial condition. *Wallace*, 2013 WL 5442074, at *4.

Phelps failed to prove that his decision to purchase franchise rights was influenced by Hunt's stated financial condition. In fact, after the problems Phelps experienced with the "build-out" of the tea store in College Station, of which he complains that Hunt misrepresented the cost of and assistance available from Tea 2 Go, Phelps made his investment in EJ T Kickers, LLC. By then, Phelps had knowledge of Hunt's competence (or lack thereof) to open, operate, and maintain retail tea stores.

## C.

### 523(a)(4) and (a)(6) Causes

Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Fraud, in this context, generally includes intentional deceit as opposed to implied or constructive fraud. *See Lester v. Dean (In re Dean)*, No. 16-43088-mxm-7, 2018 WL 4810700, at *22 (Bankr. N.D. Tex. Sept. 29, 2018). Because Hunt lawfully came into possession of Phelps's property (money), embezzlement, rather than larceny, is the appropriate cause of action of the two. *See Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998); *NF Clean v. Kakal (In re Kakal)*, 596 B.R. 335, 342 (Bankr. S.D. Tex. 2019) ("Both larceny and embezzlement involve the fraudulent appropriation of property; they differ only in timing. Larceny applies when a debtor unlawfully appropriates property at the outset, whereas embezzlement applies when a debtor unlawfully appropriates

16

after it has been entrusted to the debtor's care.") (internal citation omitted). "Embezzlement is defined for purposes of § 523(a)(4) as the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Miller*, 156 F.3d at 602 (internal quotation omitted). To except a debt from discharge for embezzlement, the objecting creditor must prove the debtor's fraudulent intent in taking the property. *Id.* at 602–03.

"[A] defalcation is a willful neglect of duty." *FNFS, Ltd v. Harwood (In re Harwood)*, 404 B.R. 366, 393 (Bankr. E.D. Tex. 2009). It "requires a culpable state of mind involving knowledge of, or gross recklessness with respect to, the improper nature of the fiduciary behavior." *Dean*, 2018 WL 4810700, at *22 (citing *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269 (2013)). Mental culpability related to a defalcation is evaluated objectively and "charges the debtor with knowledge of the law without regard to an analysis of his actual intent or motive and, accordingly, the fiduciary is presumed to know his legal obligations." *Harwood*, 404 B.R. at 393 (internal quotation and citation omitted). The relevant question, then, is "what a reasonable person in the debtor's position knew or reasonably should have known" regarding the debtor's duty owed as a fiduciary. *Id.* A mere negligent breach of fiduciary duty is not enough to constitute a defalcation under § 523(a)(4), rather the debtor must willfully abandon their duties as a fiduciary. *See id.* at 393, 398–99.

Also, "[i]n the bankruptcy context, the burden is on the creditor to establish that an affirmative defense is inapplicable—rather than on the debtor to establish that one is applicable—because the creditor has the ultimate burden of proving that a debt falls within the scope of" § 523(a)(4). *Ratliff Ready-Mix, L.P. v. Pledger (In re Pledger)*, 592 F. App'x 296, 302 n.2 (5th Cir. 2015). Such allocation of the burden of proof complies with "the principle that the Code should be strictly construed against the objecting creditor and in favor of the debtor." 4

17

*Collier on Bankruptcy* ¶ 523.10[1][c]; *see also Cowin v. Countrywide Home Loans, Inc. (In re Cowin)*, 864 F.3d 344, 349 (5th Cir. 2017) (". . . exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start.") (internal citation omitted).

Section 523(a)(6) states that a "discharge under section 727 . . . of this title does not discharge an individual debtor from any debt for willful and malicious injury by the debtor to another entity or to the property of another entity." In considering those injuries that are "willful" and "malicious," the Supreme Court wrote, "The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in original); *see also Miller*, 156 F.3d at 606 ("[W]e hold that an injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm."). A debt is thus nondischargeable if there is a finding that the injury was both willful *and* malicious. *See Miller*, 156 F.3d at 604–05.

Hunt's sale of 49% of his 100% interest in the Austin store (EJ T Kickers)—with the $50,000 that was wired by Phelps and the additional $5,000 payment made by his company, Mr. JP Ventures, LLC—raises a dischargeability question. Phelps, according to his unrebutted testimony, was assigned the claims of his LLC and thus asserts such claims. *See FDIC v. Meyer (In re Meyer)*, 120 F.3d 66, 70 (7th Cir. 1997). Hunt was in deep financial trouble at the time he solicited the $55,000 from Phelps. The stated purpose was for a 49% interest in the Austin store that was owned by EJ T Kickers, LLC. Hunt sold the store out from under Phelps within a month. Given Hunt's conduct and circumstance at the time—his dire financial condition, the solicitation of the funds, and the sale and failure to account back to Phelps—the Court infers that

Hunt, in effect, intended to procure the funds for his (Hunt's) personal benefit. Such conduct was intentional, it violated Hunt's obligation to Phelps, and, at the time, was substantially certain to cause injury to Phelps. The conduct was malicious and willful. Hunt cheated Phelps out of the $55,000. His conduct satisfies the elements for a nondischargeable claim under both § 523(a)(4) and (a)(6) of the Code.

## D.

### 727(a)(3) and (a)(4)(A) Causes

Section 727(a)(3) states

> The court shall grant the debtor a discharge, unless—the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

The court may refuse a discharge if "(1) the debtor fails to keep or preserve financial records, and (2) the failure makes it impossible for the creditor to discern the debtor's financial condition." *Buescher v. First United Bank & Tr. (In re Buescher)*, 783 F.3d 302, 307 (5th Cir. 2015). The creditor bears the initial burden of proof on both elements, and, then, the burden shifts to the debtor "to show that the failure to keep records was justified under the circumstances." *Id.* at 308.

The debtor's financial records need not contain full details of all transactions, but the debtor must be able to present an accurate representation of its financial condition. *See Lakeland W. Capital XXIII, LLC v. Black (In re Black)*, No. 17-32430-hdh7, 2018 WL 6719713, at *9 (Bankr. N.D. Tex. Dec. 18, 2018). "The adequacy of the debtor's records is determined on a case by case basis, using such considerations as the debtor's occupation, financial structure, education, experience, sophistication and any other circumstances that should be considered in

the interest of justice." *Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 697 (5th Cir. 2009) (internal quotation and citation omitted). Where there is a complete failure to distinguish between personal and business expenses of an individual debtor, making it impossible to determine the debtor's true financial condition, there exists grounds to deny the discharge under § 727(a)(3). *See Neary v. Moody (In re Moody)*, No. 18-30130-SGJ-7, 2018 WL 6653015, at *3 (Bankr. N.D. Tex. Dec. 17, 2018) (denying the debtor's discharge under § 727(a)(3) because the debtor's former employer "paid most, if not all," of the debtor's personal expenses both directly and indirectly, and the debtor could not present records of the debtor's true financial condition). Ultimately, the Court has "wide discretion" to analyze the shifting burdens of proof between the creditor and debtor and to determine the adequacy of the information disclosed by the debtor. *See Duncan*, 562 F.3d at 697.

Section 727(a)(4)(A) denies debtors a discharge if they "knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." In this circuit,

> [t]o prevail on a claim under this subsection, an objecting plaintiff (a creditor or the trustee) must prove by a preponderance of the evidence "that (1) the debtor made a . . . statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement was material to the bankruptcy case."

*Judgment Factors, LLC v. Packer (In re Packer)*, 816 F.3d 87, 94 (5th Cir. 2016) (quoting *Duncan*, 562 F.3d at 695). The omission of an asset can qualify as a false oath. *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 566 (5th Cir. 2005). On its own, however, omissions or mistakes are not enough to demonstrate fraudulent intent. *Neary v. Harding (In re Harding)*, No. 14-03078, 2015 WL 222482, at *5 (Bankr. N.D. Tex. Jan. 14, 2015) ("[M]istakes by themselves do not equal fraudulent intent meriting denial of discharge."); *Cadle Co. v. Preston-Guenther (In re Guenther)*, 333 B.R. 759, 767–68 (Bankr. N.D. Tex. 2005) (stating that it "may be close to

impossible to produce Schedules and [Statements of Financial Affairs] that contain no mistaken information, and bankruptcy papers with mistakes are not, alone, enough to bar a debtor's discharge").  Fraudulent intent requires the cumulative effect of false statements, taken with sufficient circumstantial evidence, to evidence an actual intent to deceive or a reckless disregard for the truth.  *Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380, 383 (5th Cir. 2001).  Here, the burden is on Phelps to prove such intent by a preponderance of the evidence.  *See Grogan v. Garner*, 498 U.S. 279, 289 (1991); *see also Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992).

Hunt cannot, on this record, be denied a discharge under either § 727(a)(3) or (a)(4)(A).  Phelps failed to present evidence sufficient to establish that Hunt attempted to conceal financial information by failing to provide such information to the trustee, to the Court in his Statement of Financial Affairs or Schedules, or to Phelps.[9]

The complained-of omission from Hunt's Schedule A/B that is related to the internet domain name, "nobilitea.us," is not enough to deny him a discharge under § 727(a)(4)(A).  Phelps failed to prove that the omission was made with fraudulent intent.  *See Harding*, 2015 WL 222482, at *5.  Although Hunt's Schedule A/B was not amended to include the domain name until after Phelps (and Trinkets and Tea) filed their complaints, Hunt credibly testified that he did not intend to deceive the Court or parties in interest by failing to include an asset of *de minimus* value.

---

[9] In fact, the case trustee filed his report of no distribution, noting that Hunt's estate was fully administered, on April 18, 2018.

**III.**

The Court hereby awards to Phelps a nondischargeable judgment in the amount of $55,000 against Hunt, with interest from entry of the judgment at the federal rate.  All other causes of action and relief are denied.

### End of Memorandum Opinion ###